# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON
### December 12, 2012 Session

## REGIONS BANK v. THOMAS D. THOMAS, ET AL.

**Direct Appeal from the Circuit Court for Shelby County**
**No. CT-00511307     Robert L. Childers, Judge**

---

**No. W2011-02320-COA-R3-CV - Filed March 4, 2013**

---

Plaintiff Bank accelerated a loan secured by an aircraft after Borrower failed to maintain insurance on the aircraft as required by the loan documents.  Bank filed an action to collect amounts due; took possession of and disposed of the aircraft; and sought a judgment for the deficiency.  The trial court entered judgment in favor of Bank.  Defendant Loan Guarantors appeal.  We affirm in part; reverse in part, finding that Bank did not provide sufficient notice as required by Tennessee Code Annotated § 47-9-611; and remand for further  proceedings.

## Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed in part, Reversed in part and Remanded

DAVID R. FARMER, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, P.J., W.S., and J. STEVEN STAFFORD, J., joined.

Richard E. Charlton, Memphis, Tennessee, and Kirk L. Clements, Goodlettsville, Tennessee, for the appellants, Thomas D. Thomas, Helen L. Thomas and The Thomas Family Living Trust.

David R. Evans, Chattanooga, Tennessee, and Stephen Leffler, Memphis, Tennessee, for the appellee, Regions Bank.

## OPINION

This appeal arises from a judgment entered in favor of Plaintiff/Lender Regions Bank (Regions) against Defendant Loan Guarantors in an action to collect amounts due on a loan accelerated by Regions following Borrower's alleged default for failure to maintain insurance on an aircraft pledged as collateral.  Following a hearing on May 9-11, 2011, the Circuit Court for Shelby County found that Borrower LGT Aviation, Inc. ("LGT") had breached the loan agreement executed with Regions' predecessor in interest, Union Planter's

Bank ("Union Planter's") by failing to provide insurance coverage on the collateral, a 1981 Hawker HS 125-700A aircraft ("the aircraft") during the term of the loan as required by the loan documents; that the failure to provide insurance coverage constituted default; that Regions had taken possession of and sold the aircraft in a commercially reasonable manner; and that Regions was entitled to a judgment in the amount of $1,642,771.91, plus interest at the applicable per diem interest rate in the amount of $945.15 per day for 859 days. The trial court dismissed LGT's complaint against Regions and Defendants' counter-complaint and third-party complaints. Defendant Loan Guarantors, Thomas D. Thomas, Helen L. Thomas, and the Thomas Family Living Trust (collectively, "Defendants" or "Appellants") filed a timely notice of appeal to this Court. We affirm in part, reverse in part, and remand for further proceedings.

## *Issues Presented*

Appellants present twelve issues for our review. The issues presented by this appeal, as we consolidate and re-word them, are:

(1)     Whether the trial court erred by finding that a material breach of the loan agreement had occurred.

(2)     Whether the trial court erred by declining to find that Regions' repossession of the aircraft was not in good faith and fair dealing in violation of the Uniform Commercial Code.

(3)     Whether the trial court erred by failing to find that the alleged default was not waived or cured by Regions' conduct.

(4)     Whether the trial court erred by awarding Regions a judgment for deficiency where LGT and Defendants were not given notice of the sale of the aircraft.

(5)     Whether the trial court erred by finding that Regions' repossession, repair and sale of the aircraft was commercially reasonable.

(6)     Whether, under Tennessee Rules of Civil Procedure 15.02, the trial court erred by not awarding interest at the contract rate as pled in Regions' complaint.

## *Standard of Review*

We review the trial court's findings of fact *de novo* on the record, with a presumption of correctness, and will not reverse those findings unless the evidence preponderates against them. Tenn. R. App. P. 13(d); *Berryhill v. Rhodes*, 21 S.W.3d 188, 190 (Tenn. 2000). Insofar as the trial court's determinations are based on its assessment of witness credibility, we will not reevaluate that assessment absent clear and convincing evidence to the contrary. *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002). Our review of the trial court's conclusions on matters of law, however, is *de novo* with no presumption of correctness. *Taylor v. Fezell*, 158 S.W.3d 352, 357 (Tenn. 2005). We likewise review the trial court's application of law to the facts *de novo*, with no presumption of correctness. *State v. Thacker*, 164 S.W.3d 208, 248 (Tenn. 2005).

## *Background and Procedural History*

The background facts relevant to the issues raised on appeal are largely undisputed. Defendant/Appellant Thomas D. Thomas (Mr. Thomas) is the sole shareholder and President of LGT, a Delaware corporation. In August 2004, LGT obtained a loan in the amount of $2,351,700 ("the loan") from Regions Bank's predecessor in interest, Union Planter's Bank ("Union Planters").[1] The loan documents executed by Mr. Thomas, as president of LGT, included a business loan agreement; a promissory note in the amount of $2,351,700 secured by a 1981 Hawker 700-A twin engine aircraft ("the aircraft"); an aircraft security agreement; an agreement to provide insurance; and a notice of insurance requirements. The loan was guaranteed jointly and severally by Mr. Thomas, Helen L. Thomas (Ms. Thomas), and the Thomas Family Living Trust ("the Trust"), all residents of California. Paragraph (k) of the security agreement required Borrower LGT to "keep the [a]ircraft and the [c]ollateral fully insured, with a company and under a form of policy acceptable to the Bank, against all risks and hazzards." The loan documents recited a maturity date of August 5, 2009. Principal and interest payments were payable in 59 monthly installments in the amount of $21,200, plus one irregular final balloon payment in the amount of $1,467,919.03. Interest was calculated at prime rate less one quarter of one percent; the initial interest on the loan was four percent.

In August 2006, LGT allowed the insurance policy on the aircraft to lapse. On August 22, 2006, Regions contacted Mr. Thomas by e-mail, informing him that it had received a notice of cancellation of insurance for non-payment of premium and that the loan documents required him to maintain insurance in the amount of the outstanding loan balance. Mr. Thomas responded on August 23, stating that he had been unhappy with the rates and coverage offered by the insurance carrier, that he was "having coverage placed with another

---

[1]Union Planters and Regions merged in March 2005.

carrier," and that the aircraft was in maintenance and would not be moved until insurance coverage was in place. Mr. Thomas also stated that he hoped to have insurance coverage on the aircraft by the end of that week. Regions sent Mr. Thomas a verification report to be completed by Mr. Thomas and on September 2 e-mailed Mr. Thomas requesting return of the verification report and stating, "[w]e need for you to provide insurance coverage as called for in the contract for [the aircraft]." Regions e-mailed Mr. Thomas again on September 19, stating that it had not received confirmation of insurance and advising that insurance "[was] required in order for [the] loan to continue to be in good standing." On November 14, Michael Skillern (Mr. Skillern), Regions' vice president for equipment finance, e-mailed Mr. Thomas advising him that he had failed to obtain insurance or to respond to the previous e-mails of September 2 and 19, despite requesting assistance on another matter on November 6. Mr. Skillern requested that Mr. Thomas forward proof of insurance and information on the aircraft as previously requested.

On June 11, 2007, Regions' legal counsel, Ellen Dover (Ms. Dover), sent written correspondence to Mr. Thomas and LGT advising that Regions had not received information or confirmation of insurance on the aircraft. Ms. Dover stated that Mr. Thomas had failed to respond to inquiries from Regions, and that the failure to maintain insurance coverage and to provide Regions with proof of coverage constituted a default under the loan agreement, security agreement, and promissory note. Ms. Dover demanded proof of insurance of the aircraft and information regarding the condition of the aircraft by June 29, 2007. She further advised that the failure to comply would "force Regions to take other steps to enforce its rights and protect its remedies under the Agreements, including, without limitation, the possible acceleration of all obligations due under the Loan Agreements[.]" Ms. Dover again wrote to Mr. Thomas on August 23, 2007, again informing him that the failure to provide proof of insurance constituted a default of the loan agreements. Ms. Dover advised Mr. Thomas that Regions "hereby accelerate[d] all of LGT's obligations" and demanded immediate repayment of amounts due, totaling $2,032,044.87, plus $450.87 per diem and attorney's fees, by August 30, 2007. Ms. Dover stated, "[f]ailure to pay all amounts owed by such date will result in Regions pursing all available remedies available to it under the loan agreements." Mr. Thomas did not respond to Ms. Dover's correspondence and LGT did not repay the loan.

On October 9, 2007, Regions Bank ("Regions") filed an action against Mr. Thomas, Ms. Thomas, and the Trust in the Circuit Court for Shelby County. In its complaint, Regions alleged that LGT had breached its obligation to maintain insurance coverage on the aircraft; that notice of default had been given by letter dated June 11, 2007; that notice of acceleration had been given by letter dated August 23, 2007; and that LGT had failed and refused to repay the loan. Regions prayed for a judgment for the principal sum of $2,021,212.45; accrued interest in the amount of $10,819.08; interest from and after the date of filing at the

maximum rate allowed by law; costs and attorney's fees. However, service was not effected on Ms. Thomas until January 8, 2008, or on Mr. Thomas or the Trust until April 2008.

On January 9, 2008, Regions legal counsel David Evans (Mr. Evans) sent a memo to LGT and Appellants. In his memo, Mr. Evans stated that Regions had attempted to elicit a response to no avail; that the loan had been accelerated to immediate maturity and that demand for payment in full had been made on LGT and upon Appellants as guarantors; that litigation had been instituted in Shelby County; and that Regions was "getting ready to move for a default judgment." Mr. Evans further stated that, as permitted by the loan documents, Regions had "also recently moved to place insurance on the aircraft." Mr. Evans advised Appellants that the annual cost of insurance was $18,000, and that the cost would be charged to Appellants. Mr. Evans further stated,

> [i]n the meantime, the Bank may also elect to exercise rights as a secured creditor to take possession of, store and sell the aircraft and its engines which have been pledged to secure the loan. The costs of those actions are also chargeable to you, either as the Borrower or as the guarantor of the obligations.

Mr. Evans continued,

> [w]e do not know why you continually refused to provide proof of insurance as required under the loan documents, or then failed to respond to phone calls and letters regarding notice of default, acceleration of the loan, demand for payment and ultimately institution of litigation against the three guarantors. I write one last time in an effort to elicit a response from you prior to moving for a default judgment in the pending litigation and/or the Bank's taking possession of and selling the collateral. Should you wish the Bank to consider the possibility of alternative pathways forward, you or your counsel need to promptly contact either myself . . . or the Bank officer with responsibility for the credit, Brian Hamilton[.]

Mr. Evans received no reply.

It is undisputed that from June 2005 to March 2008, the aircraft was not flown. In early 2008, Regions hired Jeff Martin (Mr. Martin), President of Martin & Martin Auctioneers, to locate the aircraft at Van Nuys, California; to determine its condition; and to remarket the aircraft for sale. The aircraft was located at the Hawker-Beechcraft FBO (fixed base operator) and was repossessed by Regions in February 2008. Repairs were undertaken to make the aircraft flight-worthy, and in March 2008 it was flown to South Carolina for further repairs. Repairs were completed by the late summer of 2008. The

record indicates that, in June 2008, Mr. Martin was receiving bids on the aircraft, pending the completion of repairs, and expected to sell the aircraft for $1.8 million to $2.3 million. Mr. Martin did not sell the aircraft, and on September 30, 2008, Regions engaged Barron Thomas to sell the aircraft. In December 2008, the aircraft was sold for a purchase price in the amount of $875,000.

In the meantime, Mr. Evans sent additional correspondence to Appellants on March 5, 2008. In his March 2008 letter, Mr. Evans again stated that repeated efforts to elicit a response from LGT or Appellants had been unsuccessful. Mr. Evans advised Appellants that, as permitted by the loan agreements, Regions had placed insurance on the aircraft and that Appellants would be responsible for the cost of such insurance. He further stated that Regions was preparing to move for a default judgment, and advised Appellants that Regions understood that a lien was being asserted against the aircraft in the amount of approximately $75,000 for storage and maintenance charges. Mr. Evans additionally advised Appellants that Regions "further underst[ood] that the aircraft [would] require as yet unknown repairs in order to enable the aircraft to be transported to any place of sale." Mr. Evans attached a copy of Regions' complaint to his correspondence, and again requested that Appellants or their legal counsel contact him to seek a resolution of the matter. Mr. Evans again received no response. It does not appear that Appellants or LGT were notified that Regions had taken possession of the aircraft.

On February 12, 2009, Regions moved for entry of a default judgment and an assessment of liquidated damages. In its motion, Regions asserted that the loan had been accelerated to immediate maturity because LGT repeatedly failed to provide evidence of insurance as required by the loan documents. It further asserted that no responsive pleadings had been filed by Appellants and that no entry of an appearance had been filed by anyone on their behalf. It further asserted that, subsequent to the filing of its action, it had learned that the aircraft had not been maintained, that it was not air-worthy and in need of significant repairs, that it had made repeated attempts to elicit a response from Appellants, and that its damages were fully calculable. Regions prayed for total damages, after credits arising from the liquidation of the collateral, in the amount of $1,654,463.79, including late fees, interest, and attorney's fees. Regions' motion for default judgment was denied by the trial court by order entered in April 2010.

Appellants filed an answer and counter-complaint on February 27, 2009.[2] In their answer, Appellants denied any wrong-doing and raised several defenses, including improper

_____

[2]Appellants also filed third-party complaints against the various facilities and brokers involved in the storage, repair and selling of the aircraft. These complaints were dismissed by the trial court and the third-party Defendants are not parties to this appeal.

-6-

service, venue and jurisdiction. In their counter-claim, Appellants asserted, *inter alia*, that the aircraft was covered by Hawker Beechcraft's policy of insurance while it was in their possession in California; that LGT had advised Regions that the aircraft was in the possession of Hawker Beechcraft and that it would not be flown until applicable insurance was procured; that LGT continued to make all payments due on the loan in a timely manner, and that payments were accepted without objection by Regions; that Regions had purchased insurance on behalf of LGT in the amount of $2,300,000 and billed LGT for the premiums, thereby curing any breach; that Regions did not send written notification that it was not waiving the breach notwithstanding accepting loan payments and billing LGT for the insurance; and that Regions caused the aircraft to be unlawfully possessed.

As noted above, the trial court heard the matter in May 2011. On June 27, 2011, the trial court entered its findings of fact and order of judgment in favor of Regions. Appellants filed a motion to alter or amend the judgment to reflect that Regions be awarded no deficiency against Appellants; that, in the alternative, that amounts expended by Regions for storage or work done on the aircraft be deducted from the judgment; that, in the alternative, the deficiency be reduced by the value of the aircraft, $2,080,000 to $2,600,000; that, in the alternative, the prejudgement interests be reduced to $139.99 per diem; that, in the alternative, the trial court amend prejudgment interest to reflect the contract rate of interest and post-judgment interest be awarded at 10 percent per annum. The trial court entered amended findings of fact and conclusions of law on September 23, 2011 (hereinafter, "findings" and "conclusions"). By order entered October 26, 2011, the trial court denied Appellants motion to alter or amend except as otherwise reflected in its amended order of September 23. This appeal ensued.

### *Discussion*

We begin our discussion by noting that it is undisputed that LGT made all payments due on the loan in a timely fashion through December 2008, when the aircraft was sold by Regions. Regions' September 30, 2007 "Problem Loan Report" reflects that in May 2004 the aircraft was appraised at $2.6 million; that a May 2004 personal financial statement indicated that Mr. Thomas had a net worth in the amount of $10 million; and that "a formal appraisal [was] in progress and the collateral [would] be pursued for possible liquidation." The default alleged by Regions was the failure to maintain insurance coverage on the aircraft. The record reflects that Regions force-placed insurance on the aircraft in September 2007 and charged the premiums to LGT, as permitted by the loan documents. We also note that it is undisputed that LGT is a closely held corporation, that Mr. Thomas is its sole shareholder, and that the aircraft was used by Mr. Thomas and his family for personal use. Further, although the loan executed by the parties is styled a "business loan," the parties represent that the loan was "on" or "to obtain" the aircraft. It is undisputed that LGT/Mr.

-7-

Thomas failed to maintain insurance on the aircraft, notwithstanding Mr. Thomas's contention that the aircraft was covered under Hawker Beechcraft's policy of insurance while it was at the California facility and, ultimately, under a policy obtained by Regions. It also is not disputed that, after August 2006, Mr. Thomas failed to respond or reply to Regions' multiple attempts to contact him. The record reflects that Mr. Evan's January and March 2008 correspondence were in the form of "Memos" and do not indicate how or to what addresses they were sent. Mr. Thomas does not dispute receiving them, however. Finally, it is not disputed that Regions took possession of the aircraft and sold it for a purchase price in the amount $875,000. With these facts in mind, we turn to the issues presented.

### *The Breach and the Obligation of Good Faith*

Appellants appear to acknowledge that the loan agreement required them to maintain insurance on the aircraft. Their argument, as we understand it, is that the trial court erred by finding that the breach was material. Appellants assert the breach was not material under the criteria established by the Restatement (Second) of Contracts adopted by the Tennessee Courts. Appellants also assert that the breach was not sufficiently material so as to justify Regions' actions when considered against the obligation of good faith required by Tennessee law and the Uniform Commercial Code ("UCC"). Appellants assert that Regions did not act in good faith by considering the loan to be in default where all payments were made on time; where Regions had the option of placing insurance on the aircraft and charging the premiums to LGT; where Regions ultimately placed insurance on the aircraft after waiting over six months to do so; where the aircraft was covered under Regions' Financial Institutions Policies; and where Regions reasonably could expect the loan and insurance premiums to be repaid. Appellants rely on Tennessee Code Annotated § 47-1-309; *Lane v. John Deere Company*, 767 S.W.2d 138 (Tenn. 1989); and *Glazer v. First American National Bank*, 930 S.W.2d 546 (Tenn. 1996), in support of their assertion that Regions acted in bad faith by declaring the loan to be in default when all loan payments were made on time.

Tennessee Code Annotated § 47-1-309 provides:

A term providing that one (1) party or that party's successor in interest may accelerate payment or performance or require collateral or additional collateral "at will" or when the party "deems itself insecure", or words of similar import, means that the party has power to do so only if that party in good faith believes that the prospect of payment or performance is impaired. The burden of establishing lack of good faith is on the party against which the power has been exercised.

Tenn. Code Ann. § 47-1-309 (Supp 2012). Under the Code, therefore, Appellants carried the

burden to demonstrate that Regions did not act in good faith by accelerating the loan.

Notwithstanding Appellants' assertion that they had made all payments as required by the loan agreement, we note that Regions received notice that the policy of insurance that initially covered the aircraft was cancelled for nonpayment; that Mr. Thomas assured Regions that he was "having coverage placed with another carrier" in August 2006; and that Mr. Thomas simply did not respond to any further inquiries or communication from Regions. We additionally note that, although all scheduled payments had been made, the last payment of a balloon payment of approximately $1.5 million was due in August 2009. It is clear from the record that Regions attempted to resolve matters before accelerating the loan, that it advised Mr. Thomas that the loan would be accelerated if he failed to respond, and that it demanded payment of the accelerated loan before it took possession of the aircraft. Mr. Thomas made no attempt to resolve the matter; indeed, he simply ignored Regions' attempt to contact him.

The issue addressed by the supreme court in *Lane v. John Deere Company* was the obligation of good faith imposed on the acceleration of a debt under an "insecurity clause" where the debt is not otherwise "in default for the non-performance of some contractual duty." *Lane v. John Deere Co.*, 767 S.W.2d 138, 140 (Tenn. 1989). The court held:

> the acceleration of a debt pursuant to an insecurity clause, the party exercising that option must act out of an honest belief the other party's ability to perform has deteriorated since the time of contracting and must not use it as an instrument of abuse. Any evidence that the belief was not rational or that the party accelerating the debt took unconscientious advantage of the other or resorted to this severe remedy for other reasons is material.

*Id*. at 142.

Although the case before us is distinguishable from *Lane*, which addressed acceleration under an "insecurity clause" and not for the failure to perform a contractual obligation, the court's analysis of the evidence relevant to good faith is instructive here. The *Lane* court cited numerous material factors relevant to the question of good faith, including the creditor's

> knowledge of the insecure circumstances at the time of contracting, *e.g., Clayton v. Crossroads Equipment Co.*, 655 P.2d 1125 (Utah 1982); his knowledge of facts that contradict the negative information acquired, *e.g., Eglin Federal Credit Union v. Curfman*, 386 So.2d 860 (Fla.App.1980); the nature and value of the collateral, *e.g., Jack M. Finley, Inc. v. Longview Bank*

*& Trust*, 705 S.W.2d 206 (Tex.App.1985); his position—whether secured or unsecured, *e.g., McKay v. Farmers & Stockmens Bank of Clayton*, 92 N.M. 181, 585 P.2d 325 (1978); any deceit or outrageous conduct in the course of the whole transaction, including repossession, *e.g., Farmers & Merchant Bank of Centre v. Hancock*, 506 So.2d 305 (Ala.1987); *Mitchell v. Ford Motor Credit Co.*, 688 P.2d 42 (Okla.1984); an abrupt departure from an established course of dealing, *e.g., Reid v. Key Bank of Southern Maine*, 821 F.2d 9 (1st Cir.1987); such circumstances relating only to the creditor as audits or personnel conflicts, *e.g., Farmers & Merchant Bank of Centre*, supra; erroneous assertion of default on some other ground, *e.g., Kupka v. Morey*, 541 P.2d 740 (Alaska 1975); the course of dealing between the parties, *e.g., Farmers & Merchant Bank of Centre*, supra; *Reid v. Key Bank*, supra; any oppressive use of his superior position, *e.g., Reid v. Key Bank*, supra; *Libby v. Twombley,* 213 Mont. 66, 689 P.2d 1226 (1984); any commercial advantage unrelated to the security of the debt, *e.g., State National Bank of El Paso v. Farah Mfg.*, 678 S.W.2d 661 (Tex.App.1984); gross negligence in record keeping, *e.g., Mitchell v. Ford Motor Credit*, supra; *see also McConnico v. Third National Bank*, 499 S.W.2d 874, 881 (Tenn.1973); prior assurances causing the other party to change position, *e.g., Libby v. Twombley*, supra; and a creditor's own conduct that contributes to the insecurity, *e.g., Kupka v. Morey*, supra.

*Id*. at 140-141.  The *Lane* court upheld the jury's verdict in favor of plaintiff debtor, but remanded on the issue of damages, finding the proof inadequate.  *Id*. at 142.

*Glazer v. First American National Bank* involved a claim for conversion arising from the embezzlement of funds from plaintiff's account by plaintiff's employee. *Glazer v. First Am. Nat'l Bank*, 930 S.W.2d 546, 547 (Tenn. 1996).  Plaintiff sought defendant's assistance in obtaining copies of insurance checks cashed by plaintiff's employee, and defendant refused.  Plaintiff sued defendant bank, asserting defendant paid insurance checks that were fraudulently endorsed, and converted his property.  Plaintiff also asserted defendant breached its duty as provided in the depository agreement by failing to cooperate.  He asserted a claim for consequential damages.  *Id*. at 549.  Defendant bank contended that, because its employees were honest, the bank did not act in bad faith so as to support an award of consequential damages under the UCC.  *Id*. at 548.  Plaintiff asserted that, because the bank did not cooperate after learning of the fraudulent scheme, it acted in bad faith.  *Id*. at 549.  The *Glazer* court opined that "bad faith can be defined as a knowing or reckless disregard of a customer's rights[,]" but that plaintiff had failed to demonstrate that the bank violated his rights by virtue of some duty to assist him.  *Id*. at 550.

Although the interpretation of a contract is a question of law which we review *de novo*, with no presumption of correctness for the conclusions of the trial court, *State ex rel. Pope v. U.S. Fire Insurance Co.*, 145 S.W.3d 529, 533 (Tenn. 2004), the determination of whether a breach has occurred is a question of fact for the trier of fact. *Carolyn B. Beasley Cotton Co. v. Ralph*, 59 S.W.3d 110, 115 (Tenn. Ct. App. 2000). As noted above, the documents executed by the parties clearly impose an obligation on LGT to maintain insurance on the aircraft. The promissory note defines default as, *inter alia*, "any 'Default' or Event of Default' [that] occurs under or with respect to any of the Security Documents or any other instrument or document executed in connection with this Note." The aircraft security agreement defines default as, *inter alia*, the "[f]ailure to maintain insurance against any of the hazards required to be insured against pursuant hereto, or cancellation of any policy providing for such insurance prior to payment of the [i]ndebtedness." The security agreement further provides that, upon the occurrence of any event of default that is not cured within 15 days of receipt of written notice of default, Regions shall have the right to, *inter alia*, declare the indebtedness due and payable in full and to take possession of the collateral and move, relocate, store, re-condition and sell the collateral. The evidence does not preponderate against the trial court's finding that Appellants breached the parties' agreement by failing to maintain a policy of insurance on the aircraft. The loan documents unambiguously imposed on Appellants an obligation to obtain and maintain insurance on the collateral, and provided that the failure to do so was an event of default. The failure to insure collateral as required by a loan agreement has been considered a default for which repossession may be a proper remedy. *McCall v. Owens*, 820 S.W.2d 748, 751 (Tenn. Ct. App. 1991). We affirm the trial court's finding that Appellants materially breached the loan agreement by failing to maintain insurance on the aircraft.

It is well-settled in Tennessee that "'the common law imposes a duty of good faith in the performance of contracts.'" *Dick Broadcasting Co., Inc. of Tenn. v. Oak Ridge FM, Inc.*, No. E2010–01685–SC–R11–CV, --- S.W.3d ---, 2013 WL 175491, at *4 (Tenn. Jan. 17, 2013)(quoting *Wallace v. Nat'l Bank of Commerce*, 938 S.W.2d 684, 686 (Tenn. 1996)). The supreme court has reiterated that "'[i]t is true that there is implied *in every contract* a duty of good faith and fair dealing in its performance and enforcement, and a person is presumed to know the law.'" *Id*. (quoting *id*. (emphasis added) (quoting *TSC Indus., Inc. v. Tomlin*, 743 S.W.2d 169, 173 (Tenn. Ct. App.1987) (citing Restatement (Second) of Contracts § 205 (1979)))). The duty of good faith, however, does not extend beyond the terms of the contract and the reasonable expectations of the parties under the contract. *Id*. at *9 (citation omitted). The obligation of good faith and fair dealing does not create additional contractual rights or obligations, and it cannot be used to avoid or alter the terms of an agreement. *Id*. (citations omitted). The question of whether a party acted in good faith is a question of fact. *Id*. at *14.

Under the facts of this case, the evidence does not preponderate against the trial

court's determination that Appellants failed to carry their burden to demonstrate that Regions acted in bad faith. The evidence contained in the record supports the trial court's finding that Regions made numerous attempts to contact Mr. Thomas prior to accelerating the loan, and Mr. Thomas's testimony confirms that he did not reply to Regions communications. Regions advised Mr. Thomas that the loan had been accelerated and of Regions' right to take possession of the aircraft, and still Mr. Thomas did not respond. Mr. Thomas acknowledges that he received correspondence sent by Regions and its legal counsel, and concedes that he did not respond or take action to obtain insurance as required by the loan documents. We affirm on this issue.

### *Waiver or Cure*

We next turn to Appellants' assertion that Regions waived breach of the obligation to maintain insurance where Regions accepted payments on the loan without objection, and that the breach was cured by Regions procurement of insurance. We begin our discussion of this issue by noting that Appellants did not specifically raise the defense of waiver in their answer or in their motion to alter or amend the judgment. Rather, the issue is tied to Appellants' assertion that Regions acted in bad faith by accepting installment payments while continuing to take actions to accelerate the loan and repossess the aircraft. We have long held that

> waiver is an intentional relinquishment of a known right and is a doctrine of very broad and general application. It concedes a right, but assumes a voluntary relinquishment of it. Our courts have held that there must be clear, unequivocal and decisive acts of the party of an act which shows determination not to have the benefit intended in order to constitute a waiver.

*Collins v. Summers Hardware and Supply Co.*, 88 S.W.3d 192, 201-202 (Tenn. Ct. App. 2002)(quoting *Gitter v. Tennessee Farmers Mut. Ins. Co.*, 60 Tenn.App. 698, 450 S.W.2d 780, 784 (1969)).

The promissory note executed by the parties in this case provides: "No waiver of any right or remedy by the Bank shall be effective unless made in writing and signed by the Bank." The loan agreement and security agreement contain similar provisions. The loan agreement further provides that "[n]o prior waiver by Lender, nor any course of dealing . . . . shall constitute a waiver." The security agreement also provides that "[a]ny delay on the part of Bank in exercising any power, privilege or right shall not preclude other or further exercise thereof . . ."

It is well-settled in Tennessee that, in general, acceleration clauses are valid and will

-12-

be enforced by the courts according to their terms. *Lively v. Drake*, 629 S.W.2d 900, 902 (Tenn. 1982). In this case, the event of default was not the failure to pay amounts due, but the failure to maintain insurance on the aircraft. Regions accelerated the loan after Mr. Thomas repeatedly failed to respond to its inquires and demands, and did not waive any right in writing. The payment of monthly installments by LGT did not result in a cure of the event of default in this case, nor did Regions accept payments without objection. Rather, Regions continually advised Mr. Thomas that the loan was in default for failure to maintain insurance. The evidence contained in the record demonstrates that Regions did not waive its rights under the contract, but repeatedly asserted that the loan was in default.

To demonstrate waiver by conduct, the proof must evidence some "absolute action or inaction inconsistent with the claim or right" waived. *Jenkins Subway, Inc. v. Jones,* 990 S.W.2d 713, 722 -23 (Tenn. Ct. App. 1998) (quoting *Koontz v. Flemming*, 65 S.W.2d at 821, 825 (Tenn. App. 1933)). Nothing in the record indicates that Regions took any action to waive the contractual obligation of insurance, nor that its subsequent steps to secure insurance cured the default.

### *Notice*

We next turn to Appellants' assertion that Regions failed to provide notice of the disposition of the aircraft as required by Article 9 of the UCC as adopted in Tennessee and codified at Tennessee Code Annotated §§ 47–9–101 through 47–9–709. The comprehensive framework established in Article 9 governs the entire secured transaction process. *Auto Credit of Nashville v. Wimmer*, 231 S.W.3d 896, 899 (Tenn. 2007). Where a borrower has defaulted, the "secured party may take possession of the collateral and may sell or otherwise dispose of it." *Id*. (citing Tenn. Code Ann. § 47–9–610(a) (2001)). However, "[e]very aspect of [the] disposition of collateral, including the method, manner, time, place, and other terms, must be commercially reasonable." *Id*. at 899-900 (quoting Tenn. Code Ann. § 47–9–610(b) (2001)). Additionally, "[a] debtor may recover damages against a creditor who fails to comply with the provisions of Article 9 governing repossession and disposition of collateral. *Id*. (citing Tenn. Code Ann. § 47–9–625(c)(2) (2001)).

Tennessee Code Annotated § 47-9-610 permits a secured party to dispose of collateral in a commercially reasonable manner. Subject to limitations not asserted here, section 47-9-611 requires a secured party to notify a debtor before the disposition of collateral. Section 47-6-612 provides that whether notification is sent within a reasonable time is a question of fact, and further provides that a notification of disposition after default ten days or more before the earliest time of disposition set forth in the notification is reasonable. Section 47-9-624 provides that a debtor may waive the right to notification of the disposition of collateral required by section 47-9-611 only by an agreement to that effect which is entered into and

-13-

authenticated after default.

The mandatory notification requirement set forth in section 47-9-611 requires that "[t]he notification must be reasonable as to the manner in which it is sent, its timeliness . . . and its content." *Auto Credit*, 231 S.W.3d at 900 (quoting Tenn. Code Ann. § 47-9-611, cmt. 2 (2001)).  Section 47-9-613 governs the contents and form of the notification required before a secured party may dispose of collateral.  The section provides:

Except in a consumer-goods transaction, the following rules apply:

(1) The contents of a notification of disposition are sufficient if the notification:
      (A) describes the debtor and the secured party;
      (B) describes the collateral that is the subject of the intended disposition;
      (C) states the method of intended disposition;
      (D) states that the debtor is entitled to an accounting of the unpaid indebtedness and states the charge, if any, for an accounting; and
      (E) states the time and place of a public disposition or the time after which any other disposition is to be made.
(2) Whether the contents of a notification that lacks any of the information specified in paragraph (1) are nevertheless sufficient is a question of fact.
(3) The contents of a notification providing substantially the information specified in paragraph (1) are sufficient, even if the notification includes:
      (A) information not specified by that paragraph; or
      (B) minor errors that are not seriously misleading.
(4) A particular phrasing of the notification is not required.
(5) The following form of notification and the form appearing in § 47-9-614(3), when completed, each provides sufficient information:

_____

NOTIFICATION OF DISPOSITION OF COLLATERAL

To: [Name of debtor, obligor, or other person to which the notification is sent]

From: [Name, address, and telephone number of secured party]

Name of Debtor(s): [Include only if debtor(s) are not an addressee]

[For a public disposition:]

We will sell [or lease or license, as applicable] the [describe collateral] [to the highest qualified bidder] in public as follows:

Day and Date:

Time:

Place:

[For a private disposition:]

We will sell [or lease or license, as applicable] the [describe collateral] privately sometime after [day and date].

You are entitled to an accounting of the unpaid indebtedness secured by the property that we intend to sell [or lease or license, as applicable] [for a charge of $ ]. You may request an accounting by calling us at [telephone number]

In this case, the trial court found that Regions sent notices of its intent to declare a default and pursue "all available remedies available to it" under the loan documents, and that, in its March 2008 correspondence, Regions stated that it reserved all rights and remedies provided by the loan documents notwithstanding the purchase of insurance by Regions. The trial court found that Regions' notice of its rights to dispose of the collateral was sufficient, and that the sale of the aircraft was commercially reasonable.

The contents of Regions' correspondence are not in dispute. Appellants assert that the correspondence is not sufficient to provide notice as required by the Code. Regions, on the other hand, asserts that its numerous attempts to contact Mr. Thomas to resolve the situation through March 2008 satisfied the notice requirements.

When considering the question of sufficiency of notice in the context of a public sale, we observed:

The purpose of this notice, without doubt, is to enable the debtor to protect his interest in the property by paying the debt, finding a buyer or being present at the sale to bid on the property or have others do so, to the end that it be not sacrificed by a sale at less than its true value.

*Mallicoat v. Volunteer Finance & Loan Corp.*, 415 S.W.2d 347, 350 (Tenn. Ct. App. 1966). The notice requirement is for the protection and benefit of the debtor. *Id*. Additionally, "[n]otice which is a mere gesture is not notice. The means employed must be such as one desirous of actually informing the absent party might reasonably adopt." *Id*. at 351 (quoting *Burden v. Burden*, 313 S.W.2d 566 (Tenn. Ct. App. 1957) (citing *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306 (1950))); *see also, International Harvester Credit Crop. v. Ingram*, 619 S.W.2d 134,137 (Tenn. Ct. App. 1981)(partially abrogated by statute on other grounds). Succinctly stated, the underlying purpose of the notice requirement is to allow the debtor "to see that the collateral brings a fair price." *Trimble v. Sonitrol of Memphis, Inc.*, 723 S.W.2d 633, 640 (Tenn. Ct. App. 1986)(quoting *International Harvester Credit Corp. v. Ingram*, 619 S.W.2d 134, 137 (Tenn. Ct. App.1981)).

In *Brunswick Acceptance Co.*, appellant debtor asserted that notice was not sufficient where, inter alia, it did not include a time after which disposition of the collateral - boats - would be made and did not provide debtor with the opportunity to find an alternative buyer. *Brunswick Acceptance Co. v. MEJ, LLC*, 292 S.W.3d 638, 643-44 (Tenn. Ct. App. 2008). We affirmed the trial court's finding that notice was sufficient where debtor had actual notice of the sale through email notifications; had the opportunity to seek competitive offers; had an opportunity to review the materials sent to dealers prior to a private sale; and where debtor did not object to potential immediate remarketing of the collateral. *Id*. at 645.

Whether a notification that lacks any of the information specified in section 47-6-613(1) is nevertheless reasonably sufficient is a question of fact for the trier of fact. *Id*. at 644 (quoting Tennessee Code Annotated § 47-9-613 and official comments). Upon review of the record in this case, however we find that the evidence preponderates against the trial court's finding that Regions' correspondence to Appellants provided sufficient notice of its intent to dispose of the aircraft under section 47-9-611. In its January 9, 2008, correspondence to Appellants, Regions advised Appellants that, in addition to obtaining insurance and charging the premiums to Appellants, it "may also elect to exercise its rights as a secured creditor to take possession of, store and sell the aircraft and its engines[.]" Regions further stated that it was writing "one last time in an effort to elicit a response from you prior to moving for a default judgment in the pending litigation and/or the Bank's taking possession of and selling the collateral." As noted above, service of process was not perfected on Mr. Thomas until January 8, 2008, or on Ms. Thomas or the Trust until April 2008. In its March 2008 correspondence, Regions' only reference to a possible sale of the aircraft was:

> The Bank further understands that the aircraft will require as yet unknown
> repairs in order to enable the aircraft to be transported to any place of sale.

Notwithstanding Mr. Thomas's failure to respond to multiple communications by Regions, and the failure of Ms. Thomas and the Trust to respond to Mr. Evans' 2008 correspondence, Tennessee Code Annotated § 47-9-611 requires "*proper* notification" and the statute requires a secured party to "provid[e] reasonable notification to the debtor of the sale of the collateral." *Auto Credit v. Wimmer*, 231 S.W.3d 896, 901-903 (Tenn. 2007)(emphasis added). In the case of sale of collateral, notice that does not afford the debtor an opportunity "to see that the collateral brings a fair price . . . is not reasonable notification and a sale under it is not commercially reasonable." *Brunswick Acceptance*, 292 S.W.3d at 643 (citing *see Mallicoat v. Volunteer Fin. & Loan Corp.,* 57 Tenn. App. 106, 415 S.W.2d 347 (1966)).

In this case, the correspondence sent by Regions contained in the record reiterated to Appellants that Regions had an option under the loan documents to take possession of and sell the aircraft, and that it might exercise its right to do so. It did not notify Appellants of a settled intent to dispose of the aircraft, of whether the aircraft would be sold by public or private sale, or on or after what date the sale would occur. Additionally, it is undisputed that Regions took possession of the aircraft in February 2008, and Regions does not dispute Appellants' assertions that they did not know that the aircraft had been taken into possession by Regions until December 2008, when it had been sold. There is nothing in the record to suggest that Appellants had actual knowledge of Regions' attempts to sell the aircraft; that Appellants had an opportunity to review marketing materials; or that Appellants had an opportunity see that the sale brought a fair price. Additionally, although Regions clearly declared a default by reason of the failure to maintain insurance, demanded accelerated payment of the balance of the loan, and suggested that it might take possession of and sell the aircraft, there is nothing in the record to demonstrate that Regions notified Appellants that it had, in fact, taken possession of the aircraft so as to provide Appellants with a reasonable opportunity to redeem the aircraft before it was sold at private sale.

We accordingly reverse the trial court's finding that Regions provided sufficient notice of the sale to Appellants. Notwithstanding Regions asserts in its brief that Appellants "were clearly given multiple opportunities to payoff the [l]oan and protect their collateral prior to the sale of the [a]ircraft," Regions' correspondence to Appellants was at best ambiguous with respect to whether, when, and by what means Regions intended to dispose of the aircraft. In its 2008 correspondence, Regions merely reiterated that it had the right to take possession of the collateral, that it "[might]" exercise its right, and that costs would be incurred were it to relocate the aircraft to a place of sale. Additionally, Regions references nothing in the record to suggest that, prior to Mr. Evans' January 2008 correspondence, Ms. Thomas or the Trust were notified that the loan was in default.

We find that Regions' correspondence to Appellants did not provide reasonably sufficient notice of disposition where it did not evidence a settled intent to sell the aircraft;

where it did not indicate whether the aircraft would be sold at public or by private sale; and where it did not set forth a disposition date on or after which the aircraft would be sold. Regions does not contend that it subsequently sent notice that was not received by Appellants. Thus, Regions acted "in clear violation of the notification statute." *See Auto Credit of Nashville v. Wimmer*, 231 S.W.3d 896, 901 (Tenn. 2007)(citing see Tenn. Code Ann. § 47-9-611(b)(Supp. 2006)).

### *Judgment for Deficiency*

As noted above, Regions did not provide sufficient notice of the disposition of the aircraft as required by Tennessee Code Annotated § 47-6-611. Accordingly, the sale of the aircraft was not commercially reasonable. *See Brunswick Acceptance Co. v. MEJ, LLC*, 292 S.W.3d 638, 643 (Tenn. Ct. App. 2008); *Mallicoat v. Volunteer Fin. & Loan Corp.*, 415 S.W.2d 347 ( Tenn. Ct. App.1966). "A debtor may recover damages against a creditor who fails to comply with the provisions of Article 9 governing repossession and disposition of collateral." *Auto Credit*, 231 S.W.3d at 900 (citing Tenn. Code Ann. § 47-9-625(c)(2)(2001)). "A debtor whose deficiency is eliminated under § 47-9-626 may recover damages for the loss of any surplus. However, a debtor or secondary obligor whose deficiency is eliminated or reduced under § 47-9-626 may not otherwise recover under subsection (b) for noncompliance with the provisions of this part relating to collection, enforcement, disposition, or acceptance." Tenn. Code Ann. § 47-9-625(d).

In an action arising from a transaction in which the amount of a deficiency or surplus is in issue, if a debtor places a secured party's compliance with provisions relating to collection, enforcement, disposition, or acceptance in issue, the secured party carries the burden of establishing that the collection, enforcement, disposition, or acceptance was conducted in accordance with the statutory provisions. Tenn. Code Ann. § 47-9-626(2). As stated above, Regions failed to demonstrate that it complied with the notice requirements set forth in §§ 47-9-611 & 613. Section 47-9-626(3) provides:

> Except as otherwise provided in § 47-9-628, if a secured party fails to prove that the collection, enforcement, disposition, or acceptance was conducted in accordance with the provisions of this part relating to collection, enforcement, disposition, or acceptance, the liability of a debtor or a secondary obligor for a deficiency is limited to an amount by which the sum of the secured obligation, expenses, and attorney's fees exceeds the greater of:
> (A) the proceeds of the collection, enforcement, disposition, or acceptance; or
> (B) the amount of proceeds that would have been realized had the noncomplying secured party proceeded in accordance with the provisions of

-18-

this part relating to collection, enforcement, disposition, or acceptance.

(4) For purposes of paragraph (3)(B), the amount of proceeds that would have been realized is equal to the sum of the secured obligation, expenses, and attorney's fees unless the secured party proves that the amount is less than that sum.

(5) If a deficiency or surplus is calculated under § 47-9-615(f), the debtor or obligor has the burden of establishing that the amount of proceeds of the disposition is significantly below the range of prices that a complying disposition to a person other than the secured party, a person related to the secured party, or a secondary obligor would have brought.

The Uniform Commercial Code Comments to the section states:

In the event the secured party is unable to meet this burden (of demonstrating that the collection, enforcement, disposition, or acceptance of collateral complied with part 6), then paragraph (3) explains how to calculate the deficiency. Under this rebuttable presumption rule, the debtor or obligor is to be credited with the greater of the actual proceeds of the disposition or the proceeds that would have been realized had the secured party complied with the relevant provisions. If a deficiency remains, then the secured party is entitled to recover it. The references to "the secured obligation, expenses, and attorney's fees" in paragraphs (3) and (4) embrace the application rules in Sections 9-608(a) and 9-615(a).

Unless the secured party proves that compliance with the relevant provisions would have yielded a smaller amount, under paragraph (4) the amount that a complying collection, enforcement, or disposition would have yielded is deemed to be equal to the amount of the secured obligation, together with expenses and attorney's fees. Thus, the secured party may not recover any deficiency unless it meets this burden.

In their brief, Appellants assert that Regions "did not attempt to" carry their burden to demonstrate that they were entitled to a deficiency under this section. The trial court made no findings with respect to this issue. In light of our reversal of the trial court's finding on the issue of notice, we remand this matter for further proceedings on the issue of the amount of the deficiency, if any, to which Regions is entitled under Tennessee Code Annotated § 47-9-626.

## *Holding*

We affirm the trial court's conclusions that the failure to maintain insurance on the aircraft constituted a breach of the loan documents and an event of default under the terms of the documents; that Regions did not waive nor cure the breach; and that Regions did not act in bad faith. We reverse the trial court's finding that Regions sufficiently complied with the notice requirements set forth in Tennessee Code Annotated §§ 47-9-611 & 613. We accordingly hold that Regions' disposition of the collateral in this case was not commercially reasonable. We vacate the award of deficiency and remand this matter to the trial court for further proceedings, including additional discovery in the discretion of the trial court, consistent with this Opinion. Remaining issues are pretermitted in light of this holding. Costs of this appeal are taxed one-half, to the Appellee, Regions Bank, and one-half to Appellants, Thomas D. Thomas, Helen L. Thomas, and the Thomas Family Living Trust, and their surety, for which execution may issue if necessary.

_____
DAVID R. FARMER, JUDGE